Edward SOLDAL and Mary Soldal, individually and as legal guardians for Jimmy Soldal, Alena Soldal, Joseph Soldal and Jessie Soldal, Plaintiffs–Appellants,

v.

COUNTY OF COOK, et al., Defendants–Appellees.

No. 89–3631.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1990.

Decided Jan. 24, 1991.

John L. Stainthorp, Peoples Law Office, Chicago, Ill., for plaintiffs-appellants.

Madeleine S. Murphy, Asst. State's Atty., Randolph M. Johnston, Office of the State's Atty. of Cook County, Chicago, Ill., for defendants-appellees.

Randolph M. Johnston, Office of the State's Atty., Chicago, Ill., John C. Vojta, Vojta & Lagattuta, Schaumburg, Ill., for Jeffrey Peterson, Kimberly Giovanni and Margaret Celeski.

Randolph M. Johnston, Office of the State's Atty., John J. George, Dennis J. Aukstik, Robert T. Oleszkiewicz, Daley & George, Chicago, Ill., for Margaret Hale and Terrence Properties Inc.

Before CUDAHY, POSNER, and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

This matter is before us on the appeal of the plaintiffs, Edward Soldal and his family, from the dismissal of their civil rights suit (42 U.S.C. § 1983) on the defendants' motion for summary judgment. The defendants are Cook County, Illinois; several officers of the Cook County sheriff's office; Terrace Properties, which owns a trailer park in Elk Grove, Illinois; and Margaret Hale, the manager of the park, together with several other private individuals.

The Soldals had rented a lot in the park as a site for their trailer home, in which they lived with their four children. In August 1987, Terrace Properties filed a suit in an Illinois state court to evict the Soldals. A hearing was scheduled for September 22, but more than two weeks before then Hale called the Cook County sheriff's office to say that she was planning to evict a family that day (September 4) and that, because she feared that the family might resist being evicted, she wanted deputy sheriffs to be present. That afternoon two employees of Terrace Properties came to the Soldals' trailer accompanied by a deputy sheriff. The employees began by wrenching the sewer and water boxes off the side of the trailer home, causing damage to it. When Soldal asked the workers what they were doing, they told him to ask the deputy sheriff, which he did, and the reply was that "he [the deputy sheriff] was there to see that [Soldal] didn't interfere with [Terrace's] workers." The workers tore off the skirting and canopy of the trailer and hooked a tractor to it. Although they also disconnected the phone, Soldal called his lawyer from a pay phone and she in turn called the sheriff's office—which at first denied that there was any deputy sheriff on the scene. Getting no satisfaction, the lawyer advised Soldal, in a second conversation from the pay phone, to file a complaint against Terrace Properties for criminal damage to his property.

When Soldal returned to the trailer from the pay phone, he found two more deputy sheriffs at the scene. He told them that he wanted to file a complaint and they referred him to a lieutenant of the sheriff's police, who was in Hale's office. Soldal went there, and the lieutenant came out and told him to wait outside, then went back in and remained closeted with Hale and several other employees of Terrace Properties for twenty to thirty minutes. When he emerged he told Soldal to talk to the district attorney, then went back into the office. Re-emerging at the end of another half hour he told Soldal that he would not accept a complaint from him because "it was between the landlord and tenant ... [and] they were going to go ahead and continue to move out the trailer." The tractor now pulled the Soldals' trailer free from its moorings. Discussion about where it would be taken ensued, in the course of which Hale said to the lieutenant in Soldal's presence, "I'm going to tell him [Soldal] this in front of you [lieutenant], that he's not allowed to come back to the park," whereupon the lieutenant told Soldal, "Now, you heard what she said."

The Soldals went off to a motel for the night (Terrace Properties had offered to pick up the tab) but left two of their children with a friend who lived in another trailer home in the park. The next morning Soldal returned to the park to pick up

the children. He was seen entering the park, and while he was in the friend's trailer a deputy sheriff (who had not been present at the eviction the previous day) came and arrested Soldal because "you're not supposed to be here." He was kept in jail for several hours, charged with criminal trespass. The charge was later dropped.

Soldal continued making unsuccessful efforts to get the sheriff's office to accept a complaint from him. He had better luck in court. On September 9 the state court in which the eviction proceeding was pending found that Terrace Properties had not been authorized to evict the Soldals, and ordered Terrace to put the trailer back on the lot. This was done, but the trailer had been badly damaged during the eviction.

A month later one of the deputy sheriffs who had been involved in the eviction came to the Soldals' trailer, together with a man named Peterson, who had accused Soldal of having struck his car and now repeated the accusation. Soldal replied by accusing Peterson of lying and invited him to step out into the street. The invitation was not taken up but the deputy sheriff asked Peterson whether he wanted to press criminal charges, and when he said he did the deputy sheriff arrested Soldal. Soldal was charged with criminal assault, apparently based on the invitation to fight rather than on whatever earlier skirmishes led the police, with Peterson in tow, to his door. He was also charged with other crimes upon the complaint of two other private persons, who are named as defendants in this suit along with Peterson. But as there is no detail in the record concerning these additional charges and defendants, we ignore them except to note that the charges were later dropped, as was the charge of assaulting Peterson.

Our recital construes the facts as favorably to the plaintiffs as the record will permit. That is what we are supposed to do when deciding whether summary judgment should have been granted. Of course the true facts may turn out to be different and less favorable to the plaintiffs.

The complaint charges in effect two conspiracies. In the first, Terrace Properties and Margaret Hale are accused of conspiring with Cook County and the officers of the sheriff's police to damage the Soldals' trailer and to arrest him without cause. In the second, Peterson is accused of having conspired with Cook County and the officers (not all the same ones) to arrest Soldal a month later. Pendent counts recast the various claims as violations of state tort law as well. On the defendants' motion for summary judgment the district judge dismissed all the claims, both federal and state, on the merits. First of all he found that there had been no conspiracy. True, there was a puzzle: "if the Terrace Properties defendants were clearly committing a criminal trespass, why did the members of the Sheriff's Police who were present—and who were called to the scene by the evicting defendants—stand idly by and do nothing? A reasonable inference would be that they conspired with the private parties not to act." But the sheriff's police "were under no state-law duty to stop the eviction, and in fact were under an opposite duty to *not* intervene on either side unless some other infringement of the criminal code was committed. . . . [A] criminal trespass arrest and prosecution cannot be used as a means to determine the right to possession. *People v. Evans*, 163 Ill.App.3d 561, [114 Ill.Dec. 662], 516 N.E.2d 817 (1st Dist.1987)." (Emphasis in original.) As for the two arrests, they were based, the district court concluded, on probable cause.

To recover damages for having been deprived of their property without due process of law, the Soldals must show first that there was a deprivation of property, and second that it was a deprivation by officers of the state. Only after these questions are answered in the affirmative does the question whether there was a denial of due process arise.

 The physical damage that Terrace's workers did to the trailer was a deprivation of property. To establish this proposition we begin by noting that if the property had been completely destroyed, this would have been as much a deprivation

as if it had been taken away. *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir.1983). Compare *United States v. General Motors Corp.*, 323 U.S. 373, 384, 65 S.Ct. 357, 362, 89 L.Ed. 311 (1945), which establishes that proposition for takings cases. "Deprivation" is the state of being deprived of something, and therefore comes into being when the property is taken from the owner; what happens to the property—whether it is used by someone else or destroyed—is an irrelevance. Severe damage is a partial but, we think, an actionable deprivation. Although we can find no cases on the point, a persuasive analogy is that temporary deprivations frequently have been held actionable under section 1983, as in *Tavarez v. O'Malley*, 826 F.2d 671, 674 (7th Cir.1987). We cannot see a principled difference between a temporary deprivation on the one hand and damage that reduces the present value of the property to the owner by the same amount, on the other. No doubt, trifling diminutions of value may be disregarded as not rising to the level of deprivations; but that is not a consideration in this case.

■ But the workers who damaged the Soldals' trailer home were private employees. Only if they, or more plausibly their boss, Hale, were in cahoots with the deputy sheriffs involved in the eviction and arrest can the Soldals obtain a judgment against these private defendants. Of course, if the Soldals can get a judgment against the public defendants, then as a practical matter they do not need to be able to get a judgment against the private ones as well, since a plaintiff is not entitled to a duplicative recovery. The Soldals need not worry that the deputy sheriffs might be judgment-proof. The state will indemnify the deputy sheriffs against any judgment that might be entered, Ill.Rev.Stat. ch. 34, ¶ 5–1002; *Joseph v. Brierton*, 739 F.2d 1244, 1246 (7th Cir.1984), and this as a practical matter guarantees the collectibility of a judgment even if Cook County is dropped as a defendant, as we think it must be for the reasons stated at the end of this opinion.

So why have the Soldals charged conspiracy? Why have they not proceeded just against the public defendants? The answer is that they must have been concerned, rightly or wrongly (wrongly as we shall see), that since a mere failure by police to prevent a private person from damaging the property of another is not actionable under the Constitution, *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Soldals would not be able get a judgment against the public defendants, at least so far as the property damage inflicted during the eviction is concerned, unless they proved that the deputy sheriffs had conspired with the private defendants and hence were responsible for the acts of the private defendants committed in furtherance of the conspiracy.

■ So let us consider whether there is any basis for supposing that there was such a conspiracy. We begin by noting that the fact that a private person calls the police to a scene of expected violence— even the fact that he persuades the police to arrest someone—does not establish a conspiracy between the police and him. *Gramenos v. Jewel Cos.*, 797 F.2d 432, 435 (7th Cir.1986); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352–53 (7th Cir.1985); *Johnson v. Miller*, 680 F.2d 39, 40–41 (7th Cir.1982). A contrary conclusion would vastly expand the reach of federal civil rights law, not only by bringing a myriad of private individuals within the law's scope but also by bringing most police inaction within its scope as well. These consequences are a reason for not letting the concept of conspiracy expand to its logical limits. And the concept itself would be deformed rather than completed by being interpreted to cover this most elementary of citizen-police interactions. A conspiracy is an agreement, and the police do not enter into an agreement with the complainant when they arrest a person upon his complaint, thereby doing their duty to enforce the law, or when they stand by at a scene of potential violence, hoping by their presence to deter a breach of the peace and in this case doing so successfully. As the cited cases explain, conspiracy comes in

when private persons and public police agree to act jointly to achieve a common end, here the removal of a troublesome tenant—troublesome, perhaps, to the police as well as to the landlord, for quite apart from having been behind in his rent, Mr. Soldal is apparently a quarrelsome fellow.

■ One bit of indirect evidence of a conspiracy of this sort is that the deputy sheriffs—whose principal function after all is enforcing eviction orders—must have known that the trailer park had no right to evict the Soldals. To evict lawfully you need an eviction order, which Terrace Properties did not have. And the deputy sheriffs knew it did not have one. Terrace Properties had brought a proceeding to obtain such an order, but you cannot on the strength of filing a complaint proceed as if you had already won and obtained an order ready to be executed. All this is perfectly plain as a matter of Illinois law. As held in *People v. Evans, supra*—it is a mystery to us why the district judge cited this case, considering his conclusion—Illinois' Forcible Entry and Detainer Act, Ill.Rev.Stat. ch. 110, ¶¶ 9–101 *et seq.*, provides the exclusive remedy for recovering possession of land from a tenant who is in actual and peaceable, although not necessarily rightful, possession of the plaintiff's property. The plaintiff can obtain a judgment of eviction against the overstaying tenant but until he does so he has no authority to dispossess the tenant. Terrace Properties obtained no judgment of eviction, either before it dispossessed the Soldals or afterward.

Why then did the deputy sheriffs not stop the eviction, and why did they not accept the criminal complaint that Soldal wanted to file against the landlord who was dispossessing him and his family unlawfully? *People v. Evans* does not hold or suggest that the police must stand by while people use violence to enforce their claims of legal right. In that case, a tenant refused to sign a lease. The landlord told her to get out. She refused. The police arrested her on the landlord's complaint for criminal trespass. The court said this was the wrong way to proceed. The landlord should have obtained an eviction order. That is exactly what Hale should have done.

■ Perhaps what the district judge had in mind in citing *Evans* is that Soldal, like the landlord in *Evans*, would not have been entitled to use self-help to prevent the removal and damage of his trailer. The deputy sheriff was on the scene to prevent him from exercising that self-help. But the situations are not symmetrical. Joyce Evans was sitting quietly in the house she had rented. She was not breaking things. There was no occasion to use force against her. Terrace's employees were destroying valuable property of the Soldals. Soldal would have been within his common law (now statutory) right of self-help to use mild force—force not intended or likely to cause an actual physical injury—to prevent that destruction. *M'Ilvoy v. Cockran,* 9 Ky. 271 (1820); Ill.Rev.Stat. ch. 38, ¶ 7–2. He certainly was entitled to call on the police to obviate the need for self-help by preventing what was undoubtedly a criminal trespass to his property, since the trespassers were not acting under even a colorable entitlement.

■ Which shows by the way that this is not a case of inaction. Without the presence of the police, Mrs. Hale might have feared to order the forcible removal of the trailer from its moorings. The police prevented Soldal from exercising his statutory right to defend his property. That is state action. *Howerton v. Gabica,* 708 F.2d 380 (9th Cir.1983); *Booker v. City of Atlanta,* 776 F.2d 272, 273 (11th Cir.1985) (per curiam). It was therefore not necessary for the Soldals' lawyer to drag in conspiracy doctrine for the purpose of imputing the action of the private defendants to the public ones, or for any other purpose that we can see. But the plaintiffs have chosen to cast their claim as one of conspiracy, thereby raising the difficult question whether the sheriff's police were acting in agreement with Mrs. Hale or other agents of Terrace Properties in preventing Soldal from defending his property; so we shall soldier on. There is some evidence of agreement, beyond the scraps already men-

tioned. The terms in which the deputy sheriffs spoke to Soldal ("we're here to prevent you from interfering with Terrace's workers" and "you heard what she said") could be thought to imply that they considered themselves Hale's agents. Then there are those long confabs between the sheriff's lieutenant and Hale and other employees of Terrace. What were they all talking about? May they not have been discussing the best, albeit an illegal, way to get rid of a village pest?

An agreement is bilateral, however; so we must ask, what could there have been in it for the sheriff's office? Well, the sheriff's office may have regarded Soldal as a troublemaker and therefore have been happy to cooperate with Terrace Properties in getting rid of him. All this is terribly speculative, though—and in the end quite irrelevant. Suppose the Soldals *have* made out a prima facie case that Terrace and Hale conspired with public officers to circumvent the procedural protections to which Illinois law entitles tenants such as the Soldals, and in the course of the conspiracy damaged the trailer. Or suppose, forgetting conspiracy, that the plaintiffs have made out a prima facie case that the sheriff's police deprived them of the trailer, which was their property, and in the course of that deprivation damaged the trailer. Either way, the plaintiffs could not, at least as they have framed the case, obtain damages for the deprivation.

The denial of procedural rights as a result of the random and unauthorized acts of subordinate public officers—a good description of the acts of the deputy sheriffs in this case—is not actionable in a suit under section 1983 unless the plaintiff lacks adequate remedies under state law. *Zinermon v. Burch*, — U.S. —, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The damage to the trailer was purely pecuniary, and can be recovered in a suit against Terrace Properties for trespass in violation of Illinois law. (We are perplexed that the Soldals did not append a state law trespass claim as a pendent to their constitutional claims.) The Soldals do not argue that such a remedy would be inadequate; make nothing of the fact that it would not be a remedy against the public defendants (and the briefs are silent about the existence or adequacy of a state law remedy against those defendants); do not argue that a pre-deprivation hearing would have been feasible; do not argue that, if such a hearing would have been feasible, a state law remedy that did not provide for one would be inadequate; make nothing of the fact that the deputy sheriff checked with his superiors during the eviction (but see *Easter House v. Felder*, 910 F.2d 1387, 1400 (7th Cir.1990) (en banc)). Finally, in their reply brief they forgo any claim to a denial of their procedural rights. We conclude that there is no issue of procedural due process before us.

This does not end the matter, because in some cases, as the Soldals emphasize, a deprivation of property can be attacked as a violation of substantive due process, and then the existence of adequate state judicial remedies is no bar to the maintenance of the constitutional tort suit. *Zinermon v. Burch, supra,* 110 S.Ct. at 983. As a matter of federal constitutional law, if the government takes private property for a public use it need only pay the owner the fair market value of the property. But if it takes private property for a private use—say it takes the Soldals' trailer and gives it to Mrs. Hale because she is a personal friend of powerful public officials—then the taking is not privileged by the takings clause of the Fifth Amendment, viewed as a grant of power to the government to take a person's property upon payment of its fair market value ("just compensation"). It is then a naked deprivation of property, and the owner is entitled to get it back or, if that is infeasible, to obtain full common law damages. An action so conceived is a plausible, though not clearly proper, invocation of substantive due process, for reasons explained in *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464–66 (7th Cir.1988). But it is of no help to the Soldals. The defendants were not trying to take the trailer and give it to someone else; they were trying to make an eviction without providing the procedural safeguards to which Illinois law

entitles a tenant; they were denying the Soldals' procedural, not their substantive, rights. Cf. *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344 (7th Cir.1986).

It makes no difference if the focus is switched from the removal of the trailer from the trailer park to the physical damage done to the trailer in the process of eviction. Since there may be, we have conceded, cases in which the taking by public officers of private property for a private rather than for a public use can be construed as a denial of substantive due process, there may also be cases in which wanton, gratuitous damage to private property by public officers can be construed as a denial of substantive due process. But that is not the nature of the Soldals' allegation. Their allegation is that the eviction was unlawful—which it was—and *therefore* they are entitled to recover the costs that the eviction imposed on them, costs that include both the damage to the trailer and the deprivation of the use of the trailer. If the limitations on challenging procedural violations on constitutional grounds can be got round by charging every *consequence* of the violation as a denial of substantive due process, those limitations are down the drain; every procedural due process claim is convertible into a substantive due process claim by the facile expedient of slicing the claim into its constituent parts. If the eviction had been proper, the incidental costs to the Soldals could not be made the basis of a constitutional claim; if it was improper—and it *was* improper—it was improper because the *procedures* prescribed by state law were not complied with.

■■■ This would be the end of the Soldals' case so far as the alleged conspiracy to evict them is concerned had the defendants not carried off the Soldals' trailer. But they did, and the Soldals argue that by doing so they seized the trailer in violation of the Fourth Amendment. If they are right, then the case again is out of the realm of purely procedural due process (i.e., right to notice and hearing); and, to repeat, a constitutional right that is not simply the elementary due process right to notice and a hearing is actionable under section 1983 regardless of the adequacy of the plaintiff's remedies under state law.

■■■ The question whether a repossession conducted or assisted by state officers is actionable under the Fourth Amendment was left open in *Fuentes v. Shevin*, 407 U.S. 67, 96 n. 32, 92 S.Ct. 1983, 2002 n. 32, 32 L.Ed.2d 556 (1972), and no other case addresses it. We are pretty confident that the Supreme Court would answer "no" if the issue ever came before the Court. Literally, it is true, what the defendants did here was to "seize" the plaintiffs' trailer. *United States v. Jacobson*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). And since the Fourth Amendment guarantees the right of the people to be secure in their houses, papers, and effects, as well as in their persons, against unreasonable searches and seizures, physical damage to a home inflicted in the course of a search, or of an arrest or other seizure, is actionable under that amendment. But the damage is not itself the search or seizure. And the second clause of the Fourth Amendment, the warrant clause, indicates, what has long been assumed with ample support in the background and legislative history of the amendment, on which see Taylor, Two Studies in Constitutional Interpretation, pt. 1 (1969); Lasson, The History and Development of the Fourth Amendment to the United States Constitution, chs. 2, 3 (1937), that the searches and seizures to which the amendment refers are those made for purposes of law enforcement, not those incident to ordinary property disputes. It is true that statutes and, even more clearly, constitutional provisions are not cabined to the particular abuses that gave rise to the enactment. A pertinent example is that the Fourth Amendment has been extended to administrative searches of a sort not envisaged when the amendment was drafted. But it is equally true that taking a word out of context, whether a semantic or an historical context, is a frequent source of interpretive error. As a practical matter, we cannot see what is to be gained by converting every repossession by state officers and every condemnation of a house into a Fourth Amendment case.

It would mean that the Supreme Court's efforts to set limits on constitutional claims of procedural irregularities would be thwarted, because every deprivation of property without due process of law would be redescribed as a seizure of property in violation of the Fourth Amendment. We conclude that until Soldal was arrested, there was no search or seizure in the Fourth Amendment sense of those words.

However devastating to the Soldals' efforts to obtain damages under federal constitutional law for damage to the trailer, this analysis does not affect Soldal's claims of false arrest. The first arrest occurred when Soldal returned the morning after the eviction to pick up his children. Had he been arrested on the street, by an officer unaware that Soldal had left his children with a friend in the trailer park, the arrest would have been based on probable cause to believe that Soldal was trespassing; for Hale had made clear to him in no uncertain terms that he was not welcome. But he was arrested at a friend's trailer home. The defendants do not argue that the arresting officer or anyone else believed that Soldal had broken into or otherwise forced his way into the trailer over the occupant's objection. He was there at the invitation of the occupant—and everyone knew this. Illinois' criminal trespass statute contains an express exception for a lessee's invitee, Ill. Rev.Stat. ch. 38, ¶ 21–3, so there is no basis for an argument that Soldal's presence in the trailer showed that he had committed a criminal trespass against Terrace Properties in order to get there. A reasonable officer would have inferred from the presence of Soldal as a guest in a tenant's home that he was not trespassing, and before making an arrest would at least have attempted to determine what Soldal was doing there, which he could easily have done by asking the tenant. When he discovered that Soldal was there at the tenant's invitation to pick up his children, he would have dropped any idea of arresting him. At least on the record before us, the arrest was not based on probable cause.

The second arrest was just as unreasonable. The test for criminal assault is whether the defendant's conduct placed the victim in *reasonable* apprehension of an imminent battery. Ill.Rev.Stat. ch. 38, ¶ 12–1(a). "Conduct" in this setting has traditionally been thought to imply a gesture, rather than just words. "Mere words" do not an assault make. *People v. Dudgeon*, 341 Ill.App. 533, 540, 94 N.E.2d 556, 560 (1950). We need not decide how much of this old saw survives in Illinois after *People v. Ferguson*, 181 Ill.App.3d 950, 130 Ill.Dec. 551, 537 N.E.2d 880 (1989), where a purely verbal threat to kick the complaining witness was held to constitute a criminal assault because the defendant was within kicking distance when he uttered the threat in what appeared to be a serious manner that made the witness think the defendant was in fact about to kick him. But all this is to one side of the present case. It has been the law for centuries, that an apprehension of an imminent battery, however created, is not reasonable if the defendant's words, however otherwise threatening, expressly negative a condition required for the battery to occur. "If it were not assize-time, I would not take such language from you." *Tuberville v. Savage*, 1 Mod.Rep. 3, 86 Eng.Rep. 684 (1699). It *was* assize time, and the victim knew it. So there was no assault. No more was there one here, so far as appears from the record. Soldal invited Peterson to step outside. That is, he invited him to fight. An invitation is not a command, and a reasonable man would know this. It is as if Soldal had said, "If you were to accept my invitation to fight, I would knock your block off." Of course there may have been something in Soldal's tone, or in accompanying gestures, that intimated that Soldal would not accept a refusal of his invitation. But there is no evidence of such additional circumstances.

The plaintiffs' false arrest claims should not have been dismissed, though what is gained by casting them in conspiracy terms eludes us, and the district judge may wish on remand to consider whether any of these conspiracy claims can be sustained. Certainly the mere fact that

Peterson filed criminal charges would not make him a conspirator with the sheriff's police. And we agree with the district judge that no basis has been presented for imposing liability on Cook County, even assuming that the sheriff, whose office ·is separate from the rest of the Cook County government, can be thought to make policy for the County. *Thompson v. Duke,* 882 F.2d 1180 (7th Cir.1989). So far· as appears, the harassment of the Soldals was an isolated abuse of power of which the sheriff and other high officials were completely ignorant, so that the harassment cannot be imputed to the county government. The doctrine of respondeat superior has been rejected for cases under section 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The plaintiffs must show direct involvement of the policy-making level of the sheriff's office in the illegal activity of its employees. *Id.* at 694, 98 S.Ct. at 2037; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). They have not done this. And for reasons stated earlier they also have failed to establish an entitlement to relief for the damage to the trailer. So the conspiracy to evict is out. But neither the main nor pendent counts relating to the arrests should have been dismissed, although the attempt to rope in the private complainants as conspirators seems dubious, to say the least. The judgment is therefore

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

I join the majority's opinion that Soldal's false arrest claims must be remanded for trial. I also believe that his due process claim should be remanded, however, and therefore respectfully dissent as to the disposition of that claim.

I differ with the majority largely because I cannot agree that "denial of procedural rights" is a "good description of the acts of the deputy sheriffs in this case." *See supra* at 1248. The majority discusses substantive due process, and acknowledges that the damage done to the Soldals' trailer was a ̍deprivation of property, one that raises at least a "plausible" substantive due process claim, but maintains that the Soldals' suit was not "an action so conceived." *See supra* at 1248. Even the defendants concede, however, that Soldal alleged a violation of substantive due process, *see* Brief at 2, and elsewhere in its opinion the court seems to acknowledge the same as well—*see supra* at 1245 (defendants "are accused of conspiring ... to damage the Soldals' trailer"). In my view, the Soldals' complaint should settle the matter, for it alleges .that the defendants conspired to deprive them of their *substantive* due process rights by, among other things, ̍damaging the trailer. *See* Complaint ¶ 31 ("Defendants ... conspired together to violate the constitutional rights of Plaintiffs by unlawfully evicting Plaintiffs, removing them from the trailer park, *and destroying their property....*") (emphasis added); *see also* ¶ 33 (explicitly alleging violation of "substantive due process"). Respectfully, these allegations do not support the majority's view that the nature of the Soldals' due process claim is procedural only.

The majority maintains that the damage to the Soldals' trailer was merely the consequence of the procedural violation, rather than an independent deprivation, but that is a neither a meaningful nor instructive distinction. An eviction order does not constitute a license to pillage the property subject to the order, and it is hard to imagine how wanton destruction inflicted during the course of an otherwise lawful eviction would be an "incidental" effect of carrying out the eviction. In my judgment, no amount of procedure could have legitimized an effort to intentionally damage the Soldals' trailer, which—reading the facts in the light most favorable to the Soldals—is what happened. As Judge Posner's factual narrative suggests, there is sufficient evidence to support an inference that the trailer park employees, aided by the actions of the sheriff's deputy, deliberately damaged the trailer. Since, as the majority recognizes, "severe damage is a partial ... but

actionable deprivation," I would remand the fourteenth amendment claim for trial.

I should also note that I do not share the majority's confidence that an unreasonable repossession conducted by state officers is not actionable under the fourth amendment. The majority fears that recognizing the Soldals' fourth amendment claim would thwart the Supreme Court's "efforts to set limits on constitutional claims of procedural irregularities ... because every deprivation of property without due process of law would be redescribed as a seizure of property in violation of the Fourth Amendment." *Supra* at 1250. The Court, however, seems less concerned with limiting procedural due process claims, and the fourth amendment, than does the majority. As Judge Posner acknowledges, the Court left this question open in *Fuentes;* even more instructive, in *Fuentes* the Court explicitly premised its reserve on the condition that a preseizure hearing take place. *See* 407 U.S. at 96 n. 32, 92 S.Ct. at 2002 n. 32 ("once a prior hearing is required, at which the applicant for a writ must establish the probable validity of his claim for repossession, the Fourth Amendment problem may well be obviated."). The Court again declined to address whether the plaintiff had a fourth amendment claim in *Zinermon*, but did point to the fourth amendment specifically as a ground that would support a § 1983 action even if state remedies to redress a deprivation were available. *See* 110 S.Ct. at 983 & n. 12. In light of the Court's language of reservation, I am reluctant to attribute to it a position that would limit fundamental constitutional rights like those encompassed in the fourth amendment.

"The strictures of the Fourth Amendment ... have been applied to the conduct of governmental officials in various civil activities." *O'Connor v. Ortega*, 480 U.S. 709, 714, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (plurality opinion). Granted, the judicial process required to make the state's seizure of property in the course of a civil proceeding comport with the fourth amendment differs from that required in a criminal investigation. *See, e.g., Murray's Lessee v. Hoboken Land and Improvement Co.*, 59 U.S. (18 How.) 272, 285, 15 L.Ed. 372 (1856); *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1150 (D.C.Cir.) (Wright, J.), *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969). But that is not to say that the amendment does not impose some minimum requirements to protect citizens from unlawful intrusions in the course of civil proceedings, whether the government institutes the action directly or whether it is acting at the behest of private parties. It does. *See, e.g., Specht v. Jensen*, 832 F.2d 1516 (10th Cir.1987); *United States v. Device More or Less Labeled Theramatic*, 641 F.2d 1289 (9th Cir.1981); *United States v. Articles of Hazardous Substance*, 588 F.2d 39, 43 (4th Cir.1978); *Founding Church of Scientology, supra; Dawes v. Philadelphia Gas Commission*, 421 F.Supp. 806, 824 (E.D.Pa.1976); *Miloszewski v. Sears Roebuck & Co.*, 346 F.Supp. 119 (W.D.Mich.1972); *Laprease v. Raymours Furniture Co.*, 315 F.Supp. 716 (N.D.N.Y.1970) (three-judge court); *cf. Wyman v. James*, 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971) (home visits by caseworker did not violate fourth amendment because they were not unreasonable); *Benigni v. City of Hemet*, 879 F.2d 473, 477 (9th Cir.1988) (fourth amendment applies to harassing "inspections" by police of a local bar); *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir.1981) (upholding § 1983 action when police assisted an unlawful eviction but not specifying the source of the constitutional violation).

The majority would confine operation of the fourth amendment to "law enforcement activities," a term that presumably encompasses civil proceedings instituted by the government, but not those instituted by private parties. Whether the government conducts a search or seizure for private or public ends, however, is but a factor bearing on the reasonableness of its action; it does not obviate the need to make the fourth amendment inquiry. *Cf. Ortega*, 480 U.S. at 730–31, 107 S.Ct. at 1504 (Scalia, J., concurring) (whether search is conducted by police or government employer does not affect availability of fourth

amendment protection; identity of government actor is relevant only to purpose and reasonableness). In either case, the government participation is just as real. By the majority's logic, an individual the police suspect of illegality, but against whom they have an insufficient quantum of cause to arrest, or to search or seize property, is entitled to greater constitutional protection against unlawful seizures than one against whom the police harbor no suspicions at all. A suspected malfeasor would have a § 1983 action, but a completely innocent victim of a governmental invasion would not.

The Supreme Court rejected a similar approach when it held the fourth amendment applicable to administrative searches in *Camara v. Municipal Court*, 387 U.S. 523, 530–31, 87 S.Ct. 1727, 1731–32, 18 L.Ed.2d 930 (1967). The Court observed that "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior" for "even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority...."; *see also Wyman*, 400 U.S. at 317, 91 S.Ct. at 386 ("one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior"); *Go–Bart Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931) (The fourth amendment "is general and forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent...."). The anomaly is particularly graphic in the majority's opinion, which affirms Soldal's § 1983 action for false arrest while denying his right to sue for the wrongful seizure of (and damage to) his trailer the day before, and where both actions stem from the same *property* dispute.

Reasonableness, which is the linchpin of the fourth amendment inquiry in all other contexts, should govern in this one as well. "A determination of the standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature

and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Ortega*, 480 U.S. at 719, 107 S.Ct. at 1498 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *Camara*, 387 U.S. at 536–37, 87 S.Ct. at 1735). When, as here, there is no significant legitimate governmental interest at stake, the alleged government action is patently unreasonable. I agree that there is little "to be gained by turning *every* repossession by state officers into a Fourth Amendment case," but neither do we gain by completely restricting the scope of constitutional protection to cases in which the government suspects one of illegal activity. Certainly, the fourth amendment should not bar every repossession or other type of governmental seizure, but it should be applied to those that, like the one alleged here, are clearly arbitrary and unreasonable.