In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-3948

CHARISE PEPPER,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF OAK PARK and
LEONARD DONAIRE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CV 3890—**Rebecca R. Pallmeyer,** *Judge.*

ARGUED SEPTEMBER 20, 2005—DECIDED NOVEMBER 30, 2005

Before CUDAHY, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* We are asked to determine whether providing "escort services" to an estranged spouse by the Oak Park Police Department gives rise to a remedy under 42 U.S.C. § 1983 for the other spouse. If Charise Pepper's colloquial characterization had accurately described Oak Park Police Officer Leonard Donaire's involvement with Pepper's husband John Redd on June 1, 2001, we might be inclined to hold in the affirmative. The phrase "escort services," however, does not fit Pepper's allegations, which in turn are not supported by the evidence. For the following reasons, we affirm the district court's grant of summary judgment in the defendants' favor.

## I. BACKGROUND

Charise Pepper married John Redd in June 1999. In October 2000, Pepper left Redd in Arizona and moved to Oak Park, Illinois, where she rented part of a residence from her brother, Kenneth Pepper. In December 2000, after reconciliation, Redd moved in with Pepper at the Oak Park residence.

Pepper and Redd's relationship deteriorated again, however, and in May 2001, police officers came to the residence in response to a call in which Pepper reported that Redd had refused to leave as she requested and had threatened to abuse her physically. Pepper claims that when the police arrived, she showed them a lease to the residence in her name only; that Redd refused to leave in the presence of the police; and that, ultimately, the officers forcibly ejected Redd from the residence. As Redd left the premises, he asked the police officers when he could return to collect his property. One of the officers told Redd that he would need a police escort to retrieve his property.

On the morning of June 1, 2001, Redd allegedly phoned Pepper and told her that he was going to burn down her house and shoot out the windows. Pepper reported these threats to the Oak Park police the same morning seeking to have Redd arrested. The officer instructed Pepper to get an order of protection against Redd, which she did not do.

Later that day, the Oak Park police dispatcher sent Officer Donaire to the residence "for a police escort. Subject wants to remove property from the house." When Donaire arrived, Pepper was not at home, but Redd and another man were present. Donaire noticed that the men had gained access to the residence through an open door with no sign of forced entry. Redd identified himself to Donaire and said that he was in the process of getting a divorce from his wife. Redd explained that he wanted to retrieve certain items he had rented from a facility in Arizona. Redd showed Donaire

several documents, including an Arizona marriage certificate, a driver's license showing the Oak Park residence as his address, an itemized rental agreement, and a typed "lease."

The rental agreement which Redd showed Donaire contained a list of various items of personal property that Redd had rented in Arizona. The "lease" contained the names "Sherry Redd and John Redd" and the address to the residence. There now is no dispute that the "lease" was a forgery because Pepper was the only rightful lessee.

From his police car, Donaire accessed the Illinois State Police's database and confirmed that Redd's address on his driver's license matched that of the residence. Donaire then asked the dispatcher whether there had been any recent police calls at the residence's address and learned about the disorderly conduct complaint called in earlier that morning. Donaire did not inquire any further about the complaint, nor did the dispatcher elaborate. Donaire ran a check on the license plates for Redd's vehicle. Finally, Donaire verified that there were no reported warrants outstanding, orders of protection, or signed complaints against Redd.

For approximately fifteen minutes, Redd and his friend moved items from Pepper's residence into Redd's vehicle and an attached trailer parked in the driveway. During this time, Donaire remained in front of the house to prevent violence or argument between Redd and Pepper should Pepper return. Donaire stayed in his police car much of this time but occasionally got out to monitor the removal of the property. Donaire inventoried the items Redd removed from the residence, most of which, including a television, a computer, and a printer, were identified on the rental agreement. The only item Redd removed that was not listed on the rental agreement was a second television set, which Redd claimed was his.

While at a beauty salon, Pepper received a telephone call from her neighbor who told her that Redd was taking "all your stuff" and that police were there. Pepper set off for home.

After loading several additional items, Redd and his friend drove away from the scene, and Donaire left soon thereafter. Moments later, Pepper arrived and discovered that personal property including her television set were gone, and that the body of her couch and its cushions had been slashed with a knife.

Pepper sued Donaire and the Village of Oak Park under 42 U.S.C. § 1983, claiming that Donaire violated the Fourth and Fourteenth Amendments by unreasonably seizing her property and denying her of substantive due process, and that Oak Park's lack of training and procedures for its police was a proximate cause of her injury. Alternatively, Pepper argued even if Donaire was entitled to qualified immunity, Oak Park remained liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for allegedly lacking adequate procedures. Finding Donaire committed no constitutional violation, the district court granted summary judgment for both Donaire and Oak Park. Pepper has abandoned her substantive due process claim and advances on appeal only her unreasonable seizure and *Monell* claims. We affirm.

## II. ANALYSIS

### A. Summary Judgment Standard

We review de novo the grant of summary judgment. *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir. 2004). Summary judgment is proper only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When

considering whether a genuine issue of material fact exists, we view all facts and make all inferences in favor of Pepper, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, summary judgment can be awarded only if no rational trier of fact could find for the non-moving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).

### B. *Pepper's Claim Against Officer Donaire*

To recover under § 1983, Pepper must prove that Donaire deprived her of a federal right while acting under color of state law. 42 U.S.C. § 1983; *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The federal right Pepper asserts is her right to property as protected by the Fourth Amendment. It is undisputed that Donaire "acted" under color of state law and that Redd by himself did not. At issue here is whether Donaire was sufficiently involved with Redd to render Pepper's alleged injury to be caused by state action.

At the outset, we must determine whether Pepper has a constitutionally protected right at stake. The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30 (1963), provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." In *Soldal v. Cook County*,[1] a § 1983 case, the Supreme Court reiterated that the Fourth Amendment applies to civil cases, 506 U.S. 56, 67 (1992), and protects property interests, *id.* at 62-63, but not all types of property, *id.* at 63 n.7

---

[1] The *Soldal* saga applies to two different aspects of Pepper's case. Here, Pepper uses the Supreme Court's holding to assert her Fourth Amendment right. As we will discuss below, Pepper separately relies upon the Seventh Circuit's finding a conspiracy under the circumstances, which was not reviewed by the Supreme Court, to buttress her conspiracy argument.

(citing *Oliver v. United States*, 466 U.S. 170, 176-77 (1984) (open fields not protected by Fourth Amendment)). The property in *Soldal* was the plaintiff's mobile home, a "house," which the Court noted was explicitly included by the text of the Fourth Amendment. *Id*. So too, we think, that Pepper's couch and television set are personal "effects" protected by the Fourth Amendment. *See Oliver*, 466 U.S. at 177 n.7 (explaining that the framers would have understood "effects" to refer to personal, rather than real, property); *Altman v. City of High Point*, 330 F.3d 194, 200-01 (4th Cir. 2003) (collecting authority).

Having found that Pepper's property is of the type protected by the Fourth Amendment, we turn to whether Pepper's effects were seized. "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal*, 506 U.S. at 61 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). In *Soldal*, the Court held that the forcible removal of the plaintiff's mobile home, leaving him dispossessed, constituted a seizure. *Id*. at 61. The interference which Pepper incurred—the permanent taking of her television and the substantial damage to her couch, while each was secured in her residence—likewise amounts to a "seizure" under the Fourth Amendment.

But before we analyze whether the seizure was unreasonable, Pepper must satisfy her burden of proving state action. This she cannot do. The protections of the Fourth Amendment apply only to governmental action and are "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Jacobsen*, 466 U.S. at 113-14 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). Pepper admits it was Redd, a private actor, who seized her property. Pepper argues Donaire was sufficiently connected to Redd

to transform Redd's private seizure into a public seizure by allegedly serving as a "look-out" for Redd and by standing by, despite allegedly knowing that Redd was stealing and damaging her property, and allowing Redd to leave.

To support her "look-out" construction, Pepper analogizes her § 1983 case to a criminal prosecution in the state of Illinois. Pepper seems to argue that because Donaire should be prosecuted, and would be guilty, under Illinois's criminal accountability theory by being a lookout, he is therefore liable to her under § 1983. But Pepper has not explained to us why a state's criminal law should inform a § 1983 analysis. Indeed, as Pepper herself notes, § 1983 "creates a species of tort liability and [we] interpret . . . it in light of the background of tort liability." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (collecting authority) (citations and quotations omitted). Because the tort of civil conspiracy permits recovery similar to that of criminal accountability, by imputing liability on one for the acts of another without creating a separate cause of action, *see Hostrop v. Bd. of Jr. College Dist. No. 515,* 523 F.2d 569, 576 (7th Cir. 1975), we agree with the defendants that Pepper's suggestion that Donaire committed criminal acts is an inflammatory, rather than legal, argument, and we will pay no heed to it.

Under any theory, to be liable under § 1983, the individual defendant must have "caused or participated in a constitutional deprivation." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)). Pepper's civil conspiracy argument derives from this court's holding in *Soldal v. Cook County*, 923 F.2d 1241 (7th Cir. 1991), which was vacated, *Soldal v. Cook County*, 931 F.2d 1073 (7th Cir. 1991), and then reinstated in part by an *en banc* review in *Soldal v. Cook County*, 942 F.2d 1073 (7th Cir. 1991), *rev'd on other grounds*, 506 U.S. (1992), which led to the Supreme Court decision previously discussed. As detailed in the

reinstated panel opinion, the owner of a trailer park phoned the Cook County sheriff's office requesting deputy sheriffs be present while she evicted the plaintiff because she feared the family would resist. 923 F.2d at 1244. The deputies were highly experienced in evictions and knew that well-established Illinois law required the landlord to obtain a court order of eviction in order for the eviction to be lawful. *Id.* at 1247. Despite the landlord's failure to produce an eviction order, the deputies allowed the landlord's employees to begin to detach the plaintiff's mobile home and remove it from the trailer park in the presence of the plaintiff. *Id.* at 1244. A deputy told the plaintiff that he was there to prevent him from interfering with the workers. *Id.* Then the sheriff's lieutenant, who was standing by in the landlord's office, refused to permit the plaintiff to lodge a criminal complaint against the landlord, telling him to take it up with the district attorney. *Id.* Subsequently, the plaintiff prevailed in state court, and the landlord's eviction was ruled improper, prompting the return of the damaged mobile home to the plaintiff. *Id.* at 1245.

The plaintiff brought a § 1983 action against Cook County, the sheriff's officers, and the trailer park owner and manager, alleging that the defendants conspired to seize and remove his mobile home. This court found that because the deputies prevented the plaintiff from using reasonable force to protect his home from private action that the deputies knew was illegal, there was sufficient evidence of conspiracy to constitute state action. *Id.* at 1247.[2]

Although we agree that the circumstances in *Soldal* could give rise to finding a conspiracy, Pepper's case is distin-

---

[2] The Supreme Court, reversing on other grounds, expressly did not review this holding of the reinstated opinion and accepted it as true. 506 U.S. at 60 n.6.

guishable in so many respects that a similar conclusion is unwarranted. In *Soldal*, without the deputies' presence, the landlord was afraid to evict the plaintiff. *Id.* Pepper argues that without Donaire's presence, Redd similarly would have been afraid to take Pepper's television and to damage her couch. Furthermore, Pepper argues, either Pepper or her neighbor would have called the police had Donaire not already been at the scene.

Unlike *Soldal*, we cannot reasonably infer that Redd was too afraid to take and to vandalize Pepper's property without the presence of police. Pepper was not present at her residence at any point during the relevant time, and Redd's motivation appears to have been to comply with the instructions the police gave him earlier that day to call for a police escort before retaking his belongings. Nor can we reasonably infer that the police's presence somehow prevented either Pepper or her neighbor from calling the police. Admittedly, it may be plausible that the presence of the police would deter someone from calling the police to the scene of a crime in progress. Such an effort might be redundant, if the police were there to stop the crime, or futile, if the police were taking part in it. But we need not consider whether Pepper's allegations would be sufficient to defeat summary judgment because she presented no evidence that either she or her neighbor were deterred from calling the police due to Donaire's presence.

Even if we were to find that Donaire's actions somehow amounted to proximate cause, it is plain from the record that Donaire lacked the requisite mental state to find that he was in cahoots with Redd. At a minimum, Pepper must show that Donaire was more than negligent—that he knew Redd was acting wrongfully "and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)). In *Soldal*, we found indirect evidence of a conspiracy where

the police were aware that the landlord's eviction without a court order was unlawful but nevertheless allowed it to proceed. 923 F.2d at 1247. But here the evidence shows the exact opposite—that Donaire took appropriate measures to eliminate any suspicion that Redd was up to no good and reasonably concluded that Redd was the rightful owner of the property and his access to the residence was lawful.

There is no circumstantial evidence upon which to infer a conspiracy between Donaire and Redd was formed. Prior to the dispatch, Donaire had never met or heard of Redd. Redd called dispatch, not Donaire directly, to get the process started, which indicates Redd had no prior knowledge that it would be Donaire who would arrive for the escort. Merely calling police to the scene of possible violence does not create a conspiracy. *Id.* at 1246 (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432, 435 (7th Cir. 1986); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352-53 (7th Cir. 1985); *Johnson v. Miller*, 680 F.2d 39, 40-41 (7th Cir. 1982)). Therefore, the earliest point at which a conspiracy could have been hatched between Redd and Donaire is when Donaire arrived at the residence. Nothing in the record suggests at any time after Donaire showed up, he and Redd somehow concocted a plan by which Donaire would help Redd steal and vandalize Pepper's property with no benefit accruing to Donaire. Nothing in the record contradicts Donaire's stated purpose—to prevent an outbreak of violence between estranged spouses—or supports Pepper's characterization that Donaire was providing an "escort service."

There is no reason for Donaire to suspect that Redd, after calling police, requesting assistance, and providing identification to Donaire, would then commit a crime in Donaire's presence. Because there was nothing under the circumstances to indicate to Donaire that Redd was not entitled to enter the residence, did not own the television set, or would vandalize the apartment, Donaire was not on notice of any

apparent wrongdoing. Donaire took reasonable measures to verify Redd's identity, address, and claim of ownership to the property he removed from Pepper's apartment. The documentation Redd provided Donaire was more than sufficient to assuage any concern which Donaire might reasonably have had that Redd's actions were wrongful. That Redd produced any proof of ownership at all for personal household items is above and beyond what the rightful owner would reasonably be expected to produce for property of this type.

It is likely that Donaire may have increased his scrutiny of Redd if he had learned of the police visit to the residence in the preceding month and the nature of the phone call to police earlier that day. However, the principle additional precaution which Donaire could have taken would have been to enter the Pepper house. But we cannot hold this against Donaire because without a warrant, exigent circumstances, or consent, he lacked authority to do so. *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 590 (1980). We conclude that the district court correctly granted summary judgment in favor of Donaire.

*C.  Pepper's Claim Against Oak Park*

As a last resort, Pepper contends that because Oak Park has not filed an answer to her amended complaint,[3] her new allegations are deemed admitted under Federal Rule of Civil Procedure 8(d), at least until her cause is remanded. On remand, if granted, Pepper claims she would not oppose Oak Park's request to file an answer. This "argument" ignores the primary role of pleadings in the federal system, which is to provide notice, not to prolong a losing case beyond its natural life. *See Conley v. Gibson*, 355 U.S. 41, 48 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."); *see also Trotter v. Jack Anderson Enters.*, 818 F.2d 431, 436 (5th Cir. 1987) (explaining that defendant's motion for summary judgment without prior responsive pleading to allegation in complaint provided plain notice that the issue was to be litigated). Rather than file an answer to the additional allegations, Oak Park filed a motion for summary judgment. Reaching the merits, Pepper concedes, as she must, that she has no case against Oak Park under *Monell* if Donaire did not violate the Fourth Amendment. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000)*; Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)*; Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 596-97 (7th Cir. 1997). As we explained, Donaire did not violate the Fourth Amendment because Pepper presented no evidence to impute

---

[3] Pepper asserted only state law claims against Oak Park in her original complaint. After Donaire and Oak Park moved for summary judgment, and after Pepper responded, the district court granted leave for Pepper to amend her complaint by adding her *Monell* claim against Oak Park.

liability to Donaire for Redd's unlawful acts. Because summary judgment in favor of Donaire was proper, Pepper has no claim against Oak Park as a matter of law, and remanding merely for Oak Park to file its answer would be a waste of time.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Leonard Donaire and the Village of Oak Park.

A true Copy:

      Teste:

 

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*