**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 17, 2019
Decided January 6, 2020

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 19-1876

| | |
|---|---|
| DALE D. DRINKWATER, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 16-cv-134-wmc |
| CHARLES LARSON, et al., *Defendants-Appellees*. | William M. Conley, *Judge*. |

**O R D E R**

Dale Drinkwater, a former Wisconsin prisoner, has a history of bilateral hip arthroplasty and chronic hip pain. While he was incarcerated, prison doctors disagreed over his need for surgery on one hip and denied his requests for outside consultations. After he was released, he sued six prison medical professionals for deliberate indifference toward his need for hip surgery. The district court granted the defendants' motion for summary judgment. On appeal Drinkwater pursues his deliberate-indifference claims against only two prison doctors—Drs. David Burnett and Charles Larson. Because Drinkwater has not adduced evidence for a reasonable jury to find that either was indifferent to his serious medical needs, we affirm the district court's judgment.

## I. Background

Drinkwater's claims focus on events that occurred in 2010 and 2011, but his earlier medical treatment provides context. Now in his mid-50s, Drinkwater had both hips replaced in the early 1990s. In August 2009 he had an appointment with an orthopedic surgeon, who noted significant wear to Drinkwater's left hip, advised that he might need revision surgery, and recommended that he see a hip specialist.[1]  Two months later he began his imprisonment at Fox Lake Correctional Institution.

That December Drinkwater expressed concerns about possible pelvic discontinuity (a distinct form of bone loss that is typically a chronic condition in failed total hip replacements) to Dr. Richard Illgen, a second orthopedic physician from the University of Wisconsin. Dr. Illgen noted that while Drinkwater would need to undergo revision surgery at some point in the future, he did not believe that surgery was appropriate at the time because he saw no evidence of pelvic discontinuity, mechanical failure, or hip dislocation. Dissatisfied with Dr. Illgen's diagnosis and reluctance to recommend surgery, Drinkwater refused to go to his follow-up appointment in February.

In May 2010 Drinkwater slipped in the prison shower and injured his hip. He was transported to a nearby emergency room where x-rays revealed a broken screw in his hip but otherwise no sign of a fracture. The emergency-room doctor diagnosed a left hip contusion and recommended that Drinkwater follow up with Dr. Illgen. The doctor recorded his conversation with Drinkwater, highlighting Drinkwater's express refusal to see any University of Wisconsin orthopedic surgeon. Drinkwater was returned to the prison and placed on pain management.

Over the next few months, Drinkwater was examined numerous times by Dr. Charles Larson, a prison physician. At an appointment in June, Drinkwater told Dr. Larson that he disagreed with Dr. Illgen's plan of care and wanted to have surgery at a facility other than the University of Wisconsin. Dr. Larson agreed to request permission for Drinkwater to be sent to Mayo Clinic or Froedtert Hospital for a second opinion and possible surgery. (The prison has a contract with the University of Wisconsin to provide medical services, so prisoners are generally allowed to seek care at Mayo or Froedtert only if a University of Wisconsin doctor believes that he is not

---

[1]  Revision surgery is performed to repair an artificial hip that has deteriorated over time due to normal wear and tear.

capable of performing surgery.) On the request form, Dr. Larson noted Dr. Illgen's opinion that surgery was premature and Drinkwater's belief that a delay in surgery would harm his long-term outcome, but Dr. Larson did not opine on the condition of Drinkwater's hip. Dr. David Burnett, the prison doctor responsible for reviewing prisoner requests for outside medical treatment, denied the request without explanation.

After learning that his request to see a Mayo or Froedtert physician was denied, Drinkwater asked Dr. Larson to correct his prison medical records. Apparently Drinkwater believed that his medical records reflected his refusal to see *any* University of Wisconsin doctor. He wanted his records corrected to reflect that he was refusing treatment from only Dr. Illgen. Dr. Larson denied Drinkwater's request, deeming Drinkwater's records accurate and complete.

Dr. Larson saw Drinkwater in September 2010, January 2011, and June 2011 for chronic pain management. At the first two appointments, Drinkwater did not report any changes in his hip functionality or an increase in pain. At the last appointment, Drinkwater refused to let Dr. Larson examine him and voiced frustration with the care that he was receiving. Drinkwater was released from prison in September 2011.

Five years later, Drinkwater sued Drs. Larson and Burnett (and four other medical professionals, whom Drinkwater has dropped from the case) for showing deliberate indifference toward his serious medical needs by not scheduling him for hip surgery after his fall in the shower. The defendants moved for summary judgment, which the district court granted. Regarding Dr. Larson, the judge concluded that no reasonable inference of deliberate indifference could be made because he did not deviate from an accepted standard of care when he provided Drinkwater with medical treatment and tried to accommodate Drinkwater's only documented request for referral to an outside specialist. Turning to Dr. Burnett, the judge found that the evidence established that the doctor reasonably relied on Dr. Illgen's opinion that surgery was unwarranted at the time, so a reasonable jury could not find that he acted with deliberate indifference when denying Drinkwater's request to receive a surgical consultation from the Mayo Clinic or Froedtert Hospital.

## II. Discussion

To survive summary judgment Drinkwater needed to present evidence allowing a reasonable jury to conclude that he suffered from an objectively serious medical

condition and that Drs. Larson and Burnett knew of and deliberately disregarded a substantial risk of harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The parties do not dispute that Drinkwater's hip condition was objectively serious. Instead, Drinkwater seeks to show that Drs. Larson and Burnett knew that their decisions would effectively prevent him from receiving any medical care. In support he points to Dr. Burnett's denial of his request to be seen by an outside specialist from Mayo or Froedtert, coupled with Dr. Larson's refusal to amend his medical records to reflect that he did not refuse treatment from all University of Wisconsin doctors.

Following Drinkwater's lead, we first turn to Dr. Burnett. Drinkwater contends that Dr. Burnett denied his request to see an outside specialist based only on the contract for medical services entered with the University of Wisconsin. Because no medical judgment was involved, he argues, this denial necessarily constitutes deliberate indifference. But no reasonable jury could find that Dr. Burnett was deliberately indifferent. When prison doctors act as administrators instead of treating physicians, as Dr. Burnett did, they are entitled to rely on the judgment of the doctors who are treating the inmate. *Rasho v. Elyea*, 856 F.3d 469, 478–79 (7th Cir. 2017). Drinkwater asked to be seen at a facility outside the University of Wisconsin system because he disagreed with Dr. Illgen's diagnosis, but he presented no evidence that Dr. Burnett knew that Dr. Illgen's medical opinions were incorrect (if that were even the case); that treatment from another University of Wisconsin physician could not have sufficiently addressed his medical needs; or that refusing Drinkwater's request to schedule an appointment at Mayo or Froedtert would cause Drinkwater not to receive any surgical intervention (if even needed). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Further, prison inmates are not entitled to demand specific care. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). No reasonable jury could conclude that Dr. Burnett was deliberately indifferent when denying Drinkwater's request.

As for Dr. Larson, Drinkwater argues that the doctor acted with deliberate indifference by refusing to amend his medical records to correct his purported refusal to be seen by a University of Wisconsin physician. According to Drinkwater, Dr. Larson must have known that his refusal would effectively preclude him from being seen by any physician—whether from Mayo, Froedtert, or the University of Wisconsin.

A reasonable jury could not conclude that Dr. Larson was deliberately indifferent. To be liable, Dr. Larson must have personally caused Drinkwater not to receive treatment. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964–65 (7th Cir. 2019); *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005). But Dr. Larson's decision not to amend Drinkwater's medical records—the utility of which is unclear and, in any event, was deemed by the doctor to be unnecessary—did not deprive Drinkwater of treatment. After Drinkwater's request to see a specialist from Mayo or Froedtert was denied, he apparently *never* again asked for an appointment with an outside specialist (or at least Dr. Larson never denied such a request). If Drinkwater made no such request, Dr. Larson would have no reason to schedule an appointment for him to see a specialist. There simply is no evidence linking Dr. Larson's refusal to amend Drinkwater's medical records with Drinkwater not receiving surgery or further outside evaluation. *See Walker*, 940 F.3d at 965–66. A reasonable jury, therefore, could not find that Dr. Larson was deliberately indifferent by rejecting Drinkwater's request to amend his records.

AFFIRMED