In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2821

GEORGE WALKER,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cv-07237 — **Sharon Johnson Coleman**, *Judge.*

ARGUED SEPTEMBER 6, 2019 — DECIDED OCTOBER 15, 2019

Before FLAUM, SYKES, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* George Walker is an inmate at State-ville Correctional Center. He has an incurable motor neuron disease called primary lateral sclerosis ("PLS") that causes weakness in his voluntary muscles. Walker alleges that his healthcare providers at Stateville—Wexford Health Sources and Dr. Saleh Obaisi—were deliberately indifferent to his medical needs after he underwent spinal surgery in March

2011.[1] Specifically, Walker alleges defendants failed to: (1) ensure he received proper follow-up care after his surgery, and (2) allowed undue delays in his treatment by outside experts. Defendants' failures, he asserts, delayed his diagnosis and caused him to suffer from the undiagnosed PLS in the interim. Defendants successfully moved for summary judgment on all of Walker's claims. We affirm.

## I. Background

During the relevant period, the State of Illinois subcontracted with Wexford Health Sources to provide healthcare services to inmates at all the facilities managed by the Illinois Department of Corrections ("IDOC"). Saleh Obaisi, M.D., was a Wexford employee who served as Stateville's Medical Director from August 2012 until his death in December 2017.

### A. Healthcare at Stateville

Stateville's onsite healthcare facilities included an urgent care center, various medical clinics, and an infirmary. The physicians, nurse practitioners, and physician's assistants at Stateville were Wexford employees; the nurses and other medical personnel were a mix of Wexford and IDOC employees. All the medical providers at Stateville, whether employed by Wexford or not, followed IDOC's administrative policies and procedures. Nonetheless, Wexford's corporate representative testified that when deciding how to provide the best care for patients, clinicians relied on their training and experience first, and the governing policies second.

---

[1] Originally, Warden Michael Lemke was a defendant, but the parties agreed to dismiss him from the case.

When the medical professionals and facilities at Stateville could not address an inmate's conditions, Wexford referred such inmates to outside providers like the University of Illinois at Chicago Medical Center ("UIC"). Typically, referrals had to go through a collegial peer review process, which Wexford called "Utilization Management" ("UM"). In the event of a medical emergency, however, Stateville's Medical Director could make referrals to another hospital, St. Joseph's Medical Center, without securing UM's preapproval.

In practice, UM consisted of a weekly conference call in which medical professionals reviewed an inmate's case and the suggested treatment. Participants in the call included: Wexford's UM Director for Illinois, Wexford's Corporate UM nurse, Wexford physicians, Wexford staff, and IDOC's healthcare unit administrator. If the onsite Medical Director was ever dissatisfied with the alternative treatment plan UM authorized for a patient, the director could appeal that decision.

If UM approved a patient for an offsite consultation at UIC, the UM department would enter the information into Wexford's computer program ("WexCare"), which triggered an electronic notice to the prison and UIC. Then, the staff at IDOC and UIC would coordinate to schedule the inmate's appointment. With respect to surgery referrals, UM often issued a "global approval," which authorized both the surgery and any necessary follow-up care. Whenever UIC received a global approval, it would call Stateville directly to arrange the follow-up care for the inmate.

UM's authorizations were valid for ninety days. From 2011 to 2014, however, Wexford did not have a system in place

to alert its staff when an authorization expired before the inmate had received treatment.[2]

### B. Walker's Treatment History at Stateville

On March 1, 2010, a Wexford physician's assistant examined Walker, noting that he had right leg twitching and reports of weakness. Over the course of the next year, Walker underwent several examinations with specialists and other medical professionals. These appointments culminated in a recommendation by a UIC neurosurgeon, Dr. Sergey Neckrysh, that Walker have spinal surgery to decompress and fuse the lumbar spine. UM gave a global approval for the surgery and follow-up care.

Walker had spinal surgery at UIC on March 23, 2011. He remained at UIC for three days following his surgery. When he returned to Stateville, the infirmary admitted him; his discharge note from UIC called for a follow-up appointment with Dr. Neckrysh in three months, including a CT scan of the lumbar spine. Walker testified that three UIC nurses told him they would see him in six to eight weeks for a follow-up CT scan. The follow-up appointment never occurred. It was the first of many delays that prompted Walker to bring this lawsuit. As Walker testified, "it's been all down hill ever since the surgery." Walker also testified, however, that none of his treating doctors have ever told him that his condition would

---

[2] Fortunately, Wexford has since eliminated this vulnerability in its system; it now requires doctors to enter a "service completion date" when they authorize an outside referral, and whenever treatment does not occur before that service completion date, the inmate's case returns to UM for discussion and potential reauthorization.

have improved if he had been sent back to UIC within three
months of his March 2011 surgery.

The medical records tell a more complicated story. During
Walker's first three days at the infirmary, five treatment notes
recorded that his surgical incision was healing well. When the
infirmary staff removed Walker's staples on April 7, 2011,
they cleaned the incision site and did not record any signs or
symptoms of redness or infection. Later that day, the infir-
mary discharged Walker, reporting his minimal discomfort
and giving him permits for low bunk, low gallery, and special
medical restraints.

Approximately four weeks after the surgery, Walker re-
ceived a physical therapy examination at Stateville. The ther-
apist stated that Walker explained that his pain had resolved,
and that the surgical scar was well-healed with minor adhe-
sion (excessive growth of scar tissue). Between May 26, 2011,
and August 31, 2012, the record shows that Walker saw Stat-
eville medical providers on eight different occasions and that
he informed them of the improvement to his back following
the surgery. Walker also completed two eight-week courses
of physical therapy with an onsite provider at Stateville. He
then did sixteen months of physical therapy in his cell. During
Walker's deposition, defendants' lawyer asked: "Did your
condition improve at all through the physical therapy?"
Walker responded: "It seemed like after the physical therapy
I would become more irritated and when I was let out of my
cell to take a shower I fall flat on my face. I couldn't walk. The
irritation was just so tight." The timing and nature of this irri-
tation, however, is unclear from Walker's testimony.

Dr. Obaisi first examined Walker on September 26, 2012,
almost exactly eighteen months after Walker's surgery. He

documented that Walker complained of an unsteady gait, weakness in his legs, upper thigh pain, and bilateral foot drop. Dr. Obaisi's appointment note also stated that he suspected that Walker might have upper motor neuron syndrome. As a result, Dr. Obaisi ordered x-rays and provided Walker with muscle relaxers and anti-inflammatory medication. Once Dr. Obaisi received the results from one of the blood tests and learned that Walker's levels were elevated, Dr. Obaisi sought UM's approval for a neurology consultation at UIC. Wexford approved the referral on December 2, 2012, but UIC did not schedule a neurology appointment until April 24, 2013.

At his deposition, Dr. Obaisi testified that his focus during this initial visit was Walker's condition; he did not "really pay attention" to whether Walker had seen UIC neurosurgery for his post-surgery visit. Nonetheless, when Walker's attorney specifically asked Dr. Obaisi why he did not send Walker back to UIC neurosurgery for the follow-up, Dr. Obaisi explained he wanted to see the results from some tests before presenting Walker's case to UM—this way, Dr. Obaisi could support his concern regarding upper motor neuron syndrome. He also testified that he did not have control over UIC's scheduling, that specialists generally prioritize scheduling by the urgency of cases, and that Dr. Neckrysh does not call people "very easily."

Walker continued to receive treatment from Dr. Obaisi and several other medical professionals. A summary of this later treatment appears below in chronological order.

- On April 9, 2013, Dr. Obaisi examined Walker for swelling in his right leg that had persisted for two weeks. Concerned that Walker was developing a

blood clot in one of his veins, Dr. Obaisi transferred Walker to St. Joseph on an emergency basis. The hospital's discharge notes state that Walker needed a repeat ultrasound of the right leg in one week to check for a blood clot.

- On April 24, 2013, Walker was transferred offsite to UIC neurology; he told Dr. Lawrence Zeidman that his back "was not bothering him much," that he had pain in his legs and groin, but that he did not want any medication. Dr. Zeidman requested a repeat MRI of the lumbar spine, an imaging test of the right lower extremity to rule out a myelopathy[3] given his blood test, and a rereferral to neurosurgery.[4]

- On May 23, 2013, Walker received an MRI that showed some degenerative changes to his L3-L4 spinal segments.

---

[3] "Myelopathy is an injury to the spinal cord due to severe compression that may result from trauma, congenital stenosis, degenerative disease or disc herniation." *Myelopathy*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited Oct. 15, 2019).

[4] Dr. Zeidman testified that his recommendations for further treatment are always directed at the referring physician—regardless of whether the patient is an inmate or not—and "it's optional to the prerogative of the referring doctor whether they even want to follow the recommendations."

- On May 28, 2013, Walker had a neurosurgery con-
  sultation at UIC. The examining neurosurgeon ob-
  served that Walker's back pain and radiculopathy[5]
  symptoms had improved, but that he had "right in-
  guinal [(*i.e.*, groin)] pain." As a result, the doctor
  recommended an x-ray of the lumbar spine. An x-
  ray was taken that same day; the impression note
  states: "Postsurgical changes with posterior spinal
  fusion from L4 to S1. There is a suggestion of lu-
  cency around the bilateral S1 screws suggesting
  hardware loosening."
- On September 25, 2013, Dr. Zeidman examined
  Walker, noting Walker was now in a wheelchair
  and complaining of radiculopathy. Dr. Zeidman
  further documented Walker's May 2013 MRI iden-
  tified a loose surgical screw at his S1 vertebrae, but
  that UIC's neurosurgery team, who had seen
  Walker after the MRI, did not seem concerned
  about it. Dr. Zeidman recommended reconsulting
  with UIC's neurosurgery team about the screw,
  and having Walker receive another MRI due to his
  presentment of a new symptom: brisk reflexes in
  his ankle, and a referral to the UIC pain clinic for a
  potential epidural steroid injection.
- On March 27, 2014, Dr. Zeidman examined Walker,
  noting that the neurosurgery follow-up and pain

---

[5] "Radiculopathy describes a range of symptoms produced by the
pinching of a nerve root in the spinal column." *Radiculopathy*, John Hop-
kins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-
diseases/radiculopathy (last visited Oct. 15, 2019).

consult he had recommended had not been done.[6]
(Dr. Zeidman believed the recommended cervical
and thoracic MRI repeat had occurred, but that the
images had not been sent to him.) Accordingly,
Dr. Zeidman again referred Mr. Walker to neuro-
surgery and the pain clinic. Additionally, Dr. Zeid-
man's notes state that Walker reported that one of
his medications (gabapentin) was improving his
pain but that he did not feel he was getting enough
physical therapy in prison.

- On October 20, 2014, Walker received an MRI of his
  cervical spine, which showed some degenerative
  joint disease.

- On October 30, 2014, Walker received an evaluation
  at UIC's pain clinic for his back and hip pain. Notes
  from that visit show that Walker reported he vol-
  untarily stopped taking pain medications because
  he felt they made him constipated. The UIC pain
  physicians instructed Walker to resume taking the
  pain medications and advised him they were con-
  sidering giving him an epidural steroid injection.

- On November 6, 2014, Walker received a thoracic
  spine MRI. The UIC radiologist found that that MRI
  was similar to Walker's 2011 (pre-surgery) MRI be-
  cause both showed degenerative disc disease in his
  back.

---

[6] Dr. Zeidman testified that he does not know how scheduling works
with IDOC, Wexford, and UIC. He also opined that he did not think it
would be "unreasonable" for it to take "a couple months" for an inmate
to get an appointment with him.

- On January 8, 2015, Walker returned to UIC neurol-
  ogy and reported continued back pain and that
  switching prescriptions (from gabapentin to Mo-
  bic) had helped his pain. Dr. Zeidman reviewed
  Walker's MRI and found that it showed degenera-
  tive joint disease but no neural compromise. It was
  Dr. Zeidman's impression that Walker may have
  had a stroke before the visit. Dr. Zeidman grew
  concerned that Walker had started slurring his
  speech and jerking his hands and fingers. Again,
  Dr. Zeidman noted that despite his referrals,
  Walker had not been sent to neurosurgery. Accord-
  ingly, he issued another referral to neurosurgery.
  He also asked to see Walker again in six months,
  and he advised Walker to continue with physical
  therapy and keep taking his pain medications.
- On February 3, 2015, Walker went to UIC neurosur-
  gery for a consultation; the neurosurgeon found
  Walker had radiculopathy in the left leg and recom-
  mended a CT myelogram[7] to delineate any possible
  neurosurgical issues at the lumbar spine.
- On March 27, 2015, Walker received an MRI of his
  brain that showed nonspecific scattered flare
  changes but was otherwise unremarkable and
  showed no acute or subacute stroke.

---

[7] "A myelogram is a diagnostic imaging test generally done by a radi-
ologist. It uses a contrast dye and X-rays or computed tomography (CT)
to look for problems in the spinal canal." *Myelogram*, John Hopkins Medi-
cine, https://www.hopkinsmedicine.org/health/treatment-tests-and-ther-
apies/myelogram (last visited Oct. 15, 2019).

- On May 28, 2015, Walker underwent a CT myelo-gram.
- On July 1, 2015, Walker returned to UIC neurology for a consultation. Dr. Zeidman noted that Walker demonstrated problems with "word-finding." Dr. Zeidman concluded that Mr. Walker needed "to see Dr. Neckrysh again given his ongoing lumbar radiculopathy issues." He also recommended a speech therapy consultation and that Walker continue taking pain medications and doing physical therapy onsite at Stateville.
- On August 11, 2015, Walker received an x-ray that showed "no definitive evidence of hardware malfunction" regarding the screw. He also had a consultation with UIC neurosurgery; Dr. Neckrysh concluded that Walker's May 2015 myelogram showed evidence of adjacent segment degeneration at L3-4 and a grade 1 spine at L3-4, and he proposed extending Walker's prior surgery "up to the L-3-4 level."[8]
- On December 22, 2015, Walker returned to UIC neurosurgery for an evaluation; the neurosurgeon confirmed the 2011 surgery was effective and that Walker did not complain of pain and weakness in

---

[8] Dr. Obaisi testified that he is typically inclined to follow UIC neurosurgery's recommendations; specifically, in Walker's case, Dr. Obaisi was happy to acquiesce to the surgery extension recommendation, though he did not believe it would affect Walker's speech or any of the other problems Dr. Obaisi believed were caused by an issue with Walker's nervous system.

his legs for two years after the surgery.[9] But be-
cause of Walker's left-sided thigh pain, UIC neuro-
surgery recommended a revision and extension of
the 2011 spinal fusion to correct these newly-occur-
ring (as of 2015) complaints.

- On March 30, 2016, Walker received the revision
  and extension spinal fusion surgery at UIC. Before
  his discharge, UIC physical therapy noted that
  there were "signs and symptoms of [upper motor
  neuron] involvement," and that "[his] gait will
  likely remain with current impairments unless
  other means for spasticity/clonus are utilized." The
  post-surgery notes state that Walker reported
  "much improvement in 'nerve' pain in both legs"
  and a reduced amount of "drooling."

- While Walker remained at UIC following his sec-
  ond spinal surgery, UIC's medical staff diagnosed
  him with PLS. During this time, Walker also con-
  sulted with UIC speech and psychology staff re-
  garding his diagnosis and what that meant for his
  life going forward.

- On April 14, 2016, UIC discharged Walker.

**C. Expert Opinions**

Each of the parties retained medical experts. Walker hired
Nicholas Rizzo, M.D., who is board-certified in internal med-

---

[9] Walker admits that the medical notes state as much, but he disputes
the assertion that he did not complain of pain or weakness in his legs for
two years after surgery and only complained of left-sided thigh pain start-
ing in 2015. As Walker testified, he asserts that he experienced pain almost
immediately after his March 2011 surgery.

icine. He has neither worked in a prison or correctional institution, nor has he treated inmate populations. He provided the following opinions: (1) Wexford and Dr. Obaisi failed to follow the order for a three-month post-operative follow-up with the UIC neurosurgeon after Walker's March 23, 2011 surgery; (2) Walker's condition deteriorated as a result of not being seen by the neurosurgeon for two years following his March 2011 surgery; (3) there was a lack of routine physical therapy; (4) Walker suffered additional pain as a result of not being treated in an appropriate and timely fashion; (5) Wexford's Medical Director at Stateville should have ensured that Walker received timely and adequate treatment; and (6) Wexford should have had a procedure in place to ensure that orders for follow-up care were followed. Dr. Rizzo also gave the following relevant testimony:

- The March 2011 surgery "was likely successful for its goal at the time."

- The three-month post-surgery visit was not optional; it was (and is) the "standard of care" and it should have been done by UIC neurosurgery. At that appointment, a few hypothetical scenarios could have played out: (1) "If there was new symptomatology …, they would have ordered additional imaging"; (2) "If … his progress postoperatively was not what they would have otherwise anticipated, they could have ordered a subsequent three-month follow-up which would have obviously increased the chance of picking up progressive symptomatology"; (3) "If he had a perfect recovery from the surgery and no symptomatology whatsoever and no progression of symptoms, they may have dismissed him from their care for that particular

surgery"; and (4) "If [his recovery was not perfect], a continuity of care for lumbar disk disease in general would have not been unreasonable."

- When asked whether it was his opinion that Walker's condition was going to deteriorate after his March 2011 surgery, regardless of whether Walker had had the three-month post-surgery follow-up visit, Dr. Rizzo said: "There's no way to know if most patients are going to progress and deteriorate or not."

Wexford employed William Davison, M.D., who is a board-certified neurologist. He provided the following relevant testimony:

- Walker's condition deteriorated after his March 2011 surgery, but the lumbar surgery could "[a]bsolutely" be ruled out as the cause of that deterioration.
- Walker's March 2011 surgery was a success because the records suggest he had less pain going down his right leg.
- The missed post-surgery appointment did not constitute inadequate medical care because Walker's problems could not be solved by neurosurgery anyway.
- The post-surgery follow-up visit was a recommendation for the referring physician to consider.
- A few months was a reasonable amount of time to wait before going back to neurosurgery.
- It was not inadequate medical treatment for defendants not to refer Walker to the pain clinic between September 25, 2013, when Dr. Zeidman

made that recommendation, and March 27, 2014, when Dr. Zeidman noted it had not yet occurred, because Walker was being seen at his local clinic for pain and was on medication.

Although not an expert, Neil Fisher, M.D., provided testimony as Wexford's designated Federal Rule of Civil Procedure 30(b)(6) witness. At the time of his deposition, he served as Wexford's Corporate Medical Director for Quality Management and Pharmacy. He previously served as Wexford's Corporate Director for UM from July 2012 until September 2014. Dr. Fisher holds a medical degree and is a general medical practitioner. He provided the following pertinent testimony:

- During this case, the WexCare system was able to pull up a report of expired UM authorizations, but he was not aware if there was a policy to pull that report in 2011–2012.
- Wexford is "usually very good at getting people back to [UIC] during the period of time that specialist is requesting" because "this is a no-charge service for us so we—these are specialists that we particularly want to satisfy what they are asking for."

**D. This Lawsuit**

The operative complaint in this case alleges that Dr. Obaisi was deliberately indifferent to Walker's serious medical needs by (1) failing to timely return Walker to UIC after the March 2011 surgery and (2) generally ignoring the persistent delays in Walker's treatment after he assumed his care. Similarly, Walker alleges that Wexford was deliberately indifferent to his serious medical needs by (1) failing to promulgate a policy

to alert the Medical Director that a previously approved referral had lapsed before the authorized treatment came to fruition and (2) relying on UIC doctors to schedule their own appointments with inmates.

Dr. Obaisi and Wexford moved for summary judgment on all of Walker's claims. They argued that Walker failed to exhaust his administrative remedies and that they were entitled to judgment on the merits of Walker's claims. The district court agreed; it granted Dr. Obaisi and Wexford's motion for summary judgment after concluding: (1) the Prison Litigation Reform Act's exhaustion requirement barred Walker's claims, 42 U.S.C. § 1997(e); (2) Dr. Obaisi was not working at the prison during the relevant time when Walker wished to be sent back to UIC for his three-month post-surgical neurosurgery follow-up appointment; (3) the totality of medical care Dr. Obaisi provided to Walker did not support a finding of deliberate indifference; (4) there was no testimony connecting Walker's condition to any failure by Dr. Obaisi; (5) some of the delays Walker blamed on Wexford were actually caused by UIC; and (6) there was no evidence that Wexford denied any medical care that one of its medical directors requested for Walker's benefit or that any delay between appointments with specialists at UIC caused Walker's deteriorating condition; and (7) the only testimony about what could have been done had Wexford personnel returned Walker to UIC for a post-operative follow-up within three months of his 2011 surgery was speculative, thus Walker could not establish the requisite causal connection between Wexford's allegedly unconstitutional policies and practices, on the one hand, and his medical condition, on the other.

Walker appeals the district court's decision to enter summary judgment for Dr. Obaisi and Wexford.

## II. Discussion

We review a district court's grant of a motion for summary judgment de novo, interpreting all facts and drawing all reasonable inferences in favor of the nonmoving party. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed R. Civ. P. 56(a)). And summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may affirm the grant of a motion for summary judgment on any ground supported in the record, so long as the parties adequately presented the issue in the district court and the nonmoving party had an opportunity to contest it. *O'Brien*, 900 F.3d at 928.

### A. Dr. Obaisi

The Eighth Amendment prohibits deliberate indifference to prisoners' serious medical needs because it constitutes an "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). A failure-to-provide-adequate-medical-care claim requires proof that the prisoner suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Defendants do not

dispute that Walker suffered from an objectively serious medical condition; only the subjective component is at issue here.

To establish the subjective component, Walker must show that Dr. Obaisi knew of facts from which he could infer that a substantial risk of serious harm existed, and that he did, in fact, draw that inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). "[E]vidence of medical negligence is not enough to prove deliberate indifference," but evidence that a medical professional "knew better than to make the medical decision[ ] that [he] did" is enough to survive summary judgment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) (quoting *Petties*, 836 F.3d at 730–31).

In practice, "[s]tate-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; … persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Whiting*, 839 F.3d at 663 (citations and quotation marks omitted). In cases such as this one—where the plaintiff alleges the defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present "verifying medical evidence" that the delay, and not the underlying condition, caused some harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citing *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007)). Most importantly, the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment. *See Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) ("Under any theory,

to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." (citation and internal quotation marks omitted)).

Walker argues on appeal that Dr. Obaisi repeatedly failed to ensure that he receive treatment within the timeline requested by UIC specialists, and that this failure delayed the ultimate PLS diagnosis and precluded alternative treatment options in the interim. Walker also disputes the notion that Dr. Obaisi was powerless to ensure timely offsite appointments.

In response, defendants argue that Dr. Obaisi had a principled reason for not immediately making a referral, as he testified: He wanted to obtain and review Walker's lab test results before presenting any follow-up care to UM for approval. Indeed, Dr. Obaisi ordered tests the day he first saw Walker. Similarly, defendants highlight that Dr. Obaisi treated Walker's symptoms while they awaited the test results and continued to treat Walker's changing condition in a variety of ways as noted above. Thus, defendants assert that there is no evidence that Dr. Obaisi did (or failed to do) something that (1) postponed Walker's treatment and thereby caused his need for a second spinal surgery, (2) delayed the diagnosis or treatment of Walker's PLS or other symptoms, or (3) prolonged Walker's pain. Finally, defendants emphasize that it is undisputed that Dr. Obaisi could not schedule appointments at UIC. Given Dr. Obaisi's lack of personal involvement in UIC scheduling, defendants insist that Dr. Obaisi cannot be held liable.

*First*, we conclude that Dr. Obaisi's decision to wait for test results before referring Walker to UIC, even though Walker was months overdue for a follow-up appointment at UIC, is

not evidence of Dr. Obaisi's deliberate indifference. As Dr. Obaisi testified, during his first appointment with Walker, he was focused on Walker's complaints—unsteady gait, occasional falls, and weak legs—and his assessment that Walker likely had either upper neuron syndrome or a muscle disorder. To rule out a muscle disorder, Dr. Obaisi requested blood tests, and he explained that he wanted those results—as well as x-ray images—before making a case to UM that Walker should be referred to UIC.

Perhaps an immediate referral to UIC would have been beneficial, but as we have held before, "an inmate is not entitled to demand specific care," *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), and medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). We defer to medical professionals' treatment decisions unless there is evidence that "no minimally competent professional would have so responded under those circumstances." *Pyles*, 771 F.3d at 409 (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

Here, Dr. Obaisi made a reasonable medical judgment to delay referring Walker until he had more information so that he could make a more informed referral request to UM. *See, e.g.*, *Zackery v. Mesrobian*, 299 F. App'x 598, 601–02 (7th Cir. 2008) ("Although it may have been prudent for Dr. Mesrobian to order diagnostic testing in 2001, his failure to choose the best course of action does not amount to a constitutional violation.").

*Second*, considering Walker's treatment overall, we believe that the records do not show a pattern of deliberate indifference to Walker's serious medical needs. To the contrary, the

record shows that Dr. Obaisi responded to Walker's changing symptoms and that he was receptive to the specialists' recommendations. He made referrals and re-referrals when necessary, all the while treating Walker's symptoms. This treatment was not outside the bounds of medical professionalism. *See, e.g., Harrison v. Wexford Health Sources, Inc.*, 669 F. App'x 797, 799 (7th Cir. 2016) ("During these 17 months [of treatment without a referral], Dr. Obaisi regularly altered [the inmate's] prescriptions for pain-relieving, anti-inflammatory, and muscle-relaxing drugs based on [the inmate's] condition. Dr. Obaisi also ordered and reviewed [the inmate's] MRI to ensure that he properly diagnosed his injury. Because the record does not contain evidence showing that Dr. Obaisi's care violated professional medical standards, the district court properly granted Dr. Obaisi summary judgment.").

That Walker's pain and other symptoms did not subside is not evidence of Dr. Obaisi's deliberate indifference, especially considering that Walker voluntarily stopped taking pain medication at some point and Dr. Obaisi ordered a variety of therapies and requested several referrals to address Walker's ongoing complaints.

*Third*, although there were clearly delays in Walker's treatment, the evidence suggests Dr. Obaisi did what he could within the limits of his role to move the ball forward. The question is whether we can place all the scheduling blame on UIC, because we can only hold Dr. Obaisi liable if he had control over the circumstances that caused the delays. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002).

Defendants have presented evidence that UIC employs a prioritization scheme for scheduling appointments and that

Stateville's Medical Director was not involved in the scheduling process. Similarly, nothing in the record suggests that Dr. Obaisi's actions or inaction caused any of the scheduling delays with Walker's appointments at UIC. Such lack of personal involvement saves Dr. Obaisi from liability here. *See Pepper*, 430 F.3d at 810.

### B. Wexford

The claim against Wexford "proceeds under the theory of municipal liability announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which we have held applies in § 1983 claims brought against private companies acting under color of state law." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795–96 (7th Cir. 2014)). Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused a constitutional violation. *Whiting*, 839 F.3d at 664.

We held in *Glisson v. Indiana Department of Corrections*, however, that this list is not exclusive; rather, a "policy" can take the form of a hands-off approach or a policy to do nothing (a "policy of inaction"). 849 F.3d 372, 379–80 (7th Cir. 2017) (en banc); *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (explaining that when a municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction."); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."); *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.").

When a § 1983 claim is based on a policy of inaction, the plaintiff must present evidence that the institution made a conscious decision not to act. *Glisson*, 849 F.3d at 381; *see also id.* at 383 (Sykes, J., dissenting) (agreeing that a "a municipality's failure to have a formal policy in place on a particular subject may represent its intentional decision not to have such a policy—that is, a policy not to have a policy—and that institutional choice may in appropriate circumstances form the basis of a *Monell* claim."). Consequently, in prison litigation, inmates generally cite other examples where a constitutional violation similarly occurred. *Id.* at 381.

Walker challenges two aspects of Wexford's operations on appeal: (1) that Wexford did not have a policy or practice of ensuring that offsite appointments authorized through UM occurred; and (2) that Wexford had a practice of deferring to UIC in scheduling offsite appointments. Walker attempts to bolster his point that Wexford's monitoring and scheduling practices presented obvious risks by focusing on Dr. Obaisi's testimony that there was no guarantee that UIC would call to schedule a follow-up appointment,[10] and to Dr. Fisher's testimony in separate litigation that as of August 2012, a large number of authorized appointments were not happening. *See Quinn v. Obaisi*, No. 14-cv-6633, 2018 WL 1184736, at *8 (N.D. Ill. Mar. 7, 2018).

In response, defendants deny responsibility for any offsite appointments that were not scheduled as requested by plac-

---

[10] Indeed, during his deposition Dr. Obaisi remarked that it was "sometimes debatable" whether UIC would call certain inmates for their follow-up appointments.

ing the blame for such errors on the onsite prison staff member, who is "likely not a Wexford employee." Defendants also cast doubt on Walker's assertion that it was foreseeable to Wexford that its monitoring and scheduling policies were "highly likely" to lead to harm. For example, defendants note that despite Wexford's financial incentive to avoid delays, it had no control over UIC's schedule. Indeed, Walker has not produced *any* evidence that Wexford *could* control UIC's schedule; it is undisputed, as defendants emphasize, that UIC is not in Wexford's chain of command. Finally, defendants argue that Walker cannot prevail because he has no evidence that other inmates faced the same treatment issues and his case is not of the "rare" cases where evidence of his own experience is sufficient to establish deliberate indifference. *See, e.g., Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (affirming a finding of *Monell* liability where the evidence showed the organization condoned its employees' repeated decisions to ignore its policies).

Neither Walker's own experience nor the testimony from Drs. Obaisi and Fisher admitting awareness that referrals to UIC were sometimes never scheduled or, if scheduled, significantly delayed, is enough to establish that Wexford was deliberately indifferent to Walker's serious medical needs. *See Glisson*, 849 F.3d at 381. Wexford's knowledge that some referrals slipped through the cracks is not the same as Wexford's knowledge that constitutionally necessary referrals were not happening with such frequency that it ignored an obvious risk of serious harm. Similarly, Walker has not shown that the standby options of Stateville's onsite medical care facilities and the nearby hospital were not sufficient as a backup plan in the intervening periods of time where an inmate awaited treatment with an outside expert.

As for the coordination of schedules with UIC, Walker's instinct that Wexford should not be able to use UIC as a shield is understandable. But Wexford cannot be accused of "deferring" to UIC when Wexford had no control over UIC. To defer to another suggests the relinquishment of power or control, which did not exist here. Practically speaking, Wexford refers many inmates, and the specialists at UIC have a finite number of appointments available; thus, it seems unavoidable that, at times, the wait for appointments will grow to a few months. Absent evidence that Wexford was on notice that these wait times were likely to cause constitutional violations, but failed to act in response, we cannot hold Wexford liable.

### C. Exhaustion

Because we conclude that the district court appropriately entered summary judgment against Walker on the merits, we need not address whether the district court correctly concluded that Walker failed to exhaust his administrative remedies.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.