**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 4, 2020[*]
Decided March 9, 2020

**Before**

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-2387

| | |
|---|---|
| STEPHEN L. GRANT, <br> *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 17-C-1579 |
| RICHARD HEIDORN, et al., <br> *Defendants-Appellees*. | William C. Griesbach, <br> *Judge*. |

**O R D E R**

Stephen Grant, a state prisoner, alleges that from 2009 to 2016, three successive primary-care doctors at Green Bay Correctional Institution refused to order an MRI or orthopedic consultation for his left knee despite persistent complaints of pain. After finally obtaining an MRI and ultimately having a knee replacement, he sued the doctors under 42 U.S.C. § 1983 claiming that they were deliberately indifferent to his pain by continuing ineffective treatments for years. He now appeals the district court's entry of

---

[*] We agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

summary judgment for the doctors. Because Grant presented no evidence suggesting that the doctors failed to exercise their professional judgment in treating him, we affirm.

## I. Background

We recount all facts in the light most favorable to Grant, the nonmoving party. *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 786 (7th Cir. 2014). Grant injured his knee in 1999 while playing basketball at a different prison. In May 2000 his treating doctor requested authorization for an orthopedic evaluation, but the request was denied. Grant then received physical therapy. One of his physical therapists opined that he might have a meniscus tear and recommended an MRI, but his treating physician rejected that recommendation.

### A. Treatment by Dr. Heidorn

In 2007 Grant was transferred to Green Bay Correctional Institution. For the next five years, Dr. Richard Heidorn treated him for many conditions, including lower back and left knee pain. Grant claims that he complained to Dr. Heidorn of knee pain at an appointment for sleep apnea in April 2007. The medical records, however, show that Dr. Heidorn first treated Grant for knee pain in June 2009 after he asked for ice for his chronic knee pain. Grant requested an MRI and orthopedic consult, and told Dr. Heidorn of the suspected meniscal tear. Grant also reported that his knee had bothered him since the 1999 injury. Dr. Heidorn observed that the knee was stable with no effusion, but that Grant "resisted motion, claiming severe pain." He diagnosed chronic knee pain and ordered an x-ray to serve as a baseline to track degenerative changes. He also prescribed nonsteroidal anti-inflammatory drugs ("NSAIDs") and a knee sleeve, and he advised continuation of the physical-therapy exercises. Dr. Heidorn believed this treatment was appropriate because his examination showed "no severe disease."

The June 2009 x-ray revealed an "unremarkable" knee. Two weeks later a follow-up x-ray revealed mild degenerative changes and minimal narrowing of the joint space. Dr. Heidorn met with Grant to explain the x-ray results and diagnosed him with moderately advanced degenerative joint disease. He recommended ice, a knee sleeve, NSAIDs, and glucosamine supplements. According to Grant's medical records, he did not complain about his knee again until January 2010 (although he had many medical appointments) when he requested a "no kneel" order. Dr. Heidorn granted that request the next day.

Grant had a third x-ray in March 2010 because he complained of increased pain and decreased range of motion. The x-ray revealed no significant changes. Dr. Heidorn saw no evidence that Grant's degenerative joint disease had become significant and did not think an MRI was necessary. Grant's medical records show no further complaints of knee pain until May 2011 when he requested more ice.

Another knee x-ray was taken in July 2011, which again showed no significant progression of degenerative joint disease. Dr. Heidorn did not request an MRI, despite Grant's request that he do so, because the x-rays provided a "baseline to evaluate the progression of the degenerative disease that existed in Grant's left knee," and the x-rays showed no significant changes. In his declaration Dr. Heidorn attested that he lacked the "significant physical findings based on x-rays and evaluations" to request approval for an MRI or orthopedic consult.

The next month Dr. Heidorn did, however, order a physical-therapy evaluation and six physical-therapy appointments. Grant attended his initial physical-therapy evaluation and two follow-up appointments. The records reflect that at the second follow-up appointment in November 2011, Grant had decided that "the only way he will cooperate is when he has an MRI that rules out everything else." Grant denies being uncooperative and asserts instead that his physical-therapy regimen was intended to end after his November appointment.

Throughout five years of treatment, Dr. Heidorn responded to Grant's periodic complaints of knee pain by ordering a low bunk, a no-kneel restriction, in-cell meals, extra blankets and pillows to prop up his leg (although this was primarily for back pain), ice as needed, and physical therapy. Dr. Heidorn also prescribed several different medications, and when Grant reported that they were ineffective, he changed the dosage or prescribed a new medication. Dr. Heidorn attested that although Grant's degenerative disease might eventually require knee replacement, the degeneration did not reach that level on his watch.

**B. Treatment by Dr. Sumnicht**

In October 2012 Dr. Paul Sumnicht took over Grant's care. At Grant's first appointment in February 2013, Dr. Sumnicht observed left leg weakness but believed it was related to Grant's ongoing back problems. Back x-rays revealed disk problems that Dr. Sumnicht determined could be pinching the nerves affecting the knees. Dr. Sumnicht examined the left leg and knee, and the tests were negative. The knee showed exterior swelling. Unsure of the etiology, Dr. Sumnicht ordered arthritis blood

tests and another x-ray, and he discontinued a cholesterol medication he suspected as a possible cause. He continued ongoing treatments of ibuprofen for pain and knee swelling and nortriptyline for chronic back pain.

This x-ray showed joint narrowing and mild degenerative changes with no effusion. Dr. Sumnicht diagnosed mild osteoarthritis of the left knee. He discussed these results in March 2013, observing that the knee had no swelling and had not been "giving out." Grant did have a limp in his left leg and tenderness in the tissue around his knee. Dr. Sumnicht ordered a compression stocking to avert fluid build-up and nerve pain. He "found no objective signs that would indicate an MRI was needed." Dr. Sumnicht continued the ibuprofen and nortriptyline and added pain cream. He also addressed Grant's back pain.

Dr. Sumnicht next saw Grant in May 2013, but the appointment focused on Grant's worsening back pain. Dr. Sumnicht ordered an MRI of the lumbar spine. Though they discussed Grant's knee pain, Dr. Sumnicht did not believe an MRI was warranted because he observed no signs that the degenerative knee condition was worsening. A few weeks later, Grant saw Dr. Sumnicht to discuss the back MRI. Dr. Sumnicht determined that Grant's lower back was the most serious issue at the time, so he did not assess the knee, believing his mild arthritis was properly treated with conservative pain management. He did not treat Grant again.

## C. Treatment by Dr. Sauvey

Dr. Mary Sauvey treated Grant from October 2013 through May 2016 at 32 appointments for a range of medical issues, including degenerative disk disease and left knee pain. Dr. Sauvey attested that Grant complained of knee pain at only 3 appointments. However, Grant contends that he complained every time he saw Dr. Sauvey, but she would only treat his back pain. The record contains numerous Health Service Request forms from Grant, several of which include complaints of knee pain, but these forms were screened by medical staff and often resolved without a doctor's appointment. It is not clear how many of these request forms Dr. Sauvey reviewed.

Dr. Sauvey first noted Grant's complaint of left knee pain in July 2014. At that appointment she deemed his knee pain secondary to his back pain. She did not believe an MRI or orthopedic referral was clinically necessary and continued Grant's conservative treatment with the addition of an elastic wrap and lidocaine gel. Grant says that he never received the wrap and that the gel was not helpful. Dr. Sauvey's

records do not mention Grant's knee pain again until January 2016, when they discussed plans for back surgery. Grant stated that he would also like an MRI or orthopedic referral for his knee. Believing that his degenerative knee disease was mild to moderate and age related, Dr. Sauvey prescribed ice, oral NSAIDs, and rest. Dr. Sauvey believed that Grant's back pain, which she continued to consider more serious partly because he could not walk without an assistive device, could complicate an exam and treatment of his knee because pinched nerves from his low back can cause leg pain. Thus, she determined that his serious back condition should be addressed first.

Grant had lumbar spine surgery in early February 2016. Dr. Sauvey saw him several times between January and March 2016, but her notes do not reference knee pain again until April. At that time Dr. Sauvey diagnosed Grant with degenerative joint disease of the left knee; she continued his medications, prescribed a knee sleeve, and scheduled him for a steroid injection in his left knee. It was Dr. Sauvey's medical opinion that an MRI or orthopedic referral was warranted only if the steroid injection and knee sleeve failed or if Grant developed symptoms limiting his function. About a week later, Dr. Sauvey gave Grant the steroid injection in his left knee and did not see him again before her departure the next month.

**D. Subsequent Treatment**

Dr. Dilip Tannan took over Grant's treatment in June 2016. He referred Grant to advanced pain management for hip-joint injections and ordered x-rays and physical therapy for his knee. In August he observed that Grant now had limited range of motion in his left knee along with swelling from degenerative arthritis. Dr. Tannan ordered an MRI due to Grant's worsening symptoms, decreasing functionality, and the unsuccessful course of conservative pain management.

An MRI of the knee taken October 2016 revealed a multitude of conditions, including a complex degenerative tear of the lateral meniscus, joint effusion, a small Baker's cyst, mild osteoarthritis, and severe chondromalacia (thinning cartilage). Dr. Tannan opined that no injury or precipitating event caused these conditions; rather, he believed that they were caused by slow, gradual changes over time. These results did not require any emergency surgery or pressing treatment.

Dr. Tannan referred Grant to an orthopedic specialist, who saw him in December 2016 and diagnosed osteoarthritis and an "incidental" meniscal tear in his knee. The specialist recommended further conservative treatment and prescribed steroid injections, physical therapy, and fluid injections. Grant did not improve. After another

x-ray in June 2017 showed moderate degenerative arthritis with additional joint narrowing, the orthopedist recommended arthroscopy (a less invasive surgical procedure) over knee replacement. But in August 2017 Grant elected to have a total knee replacement. Dr. Tannan attested that the surgery was performed to treat Grant's knee arthritis, not his ligament tears.

### E. Procedural History

After the 2016 MRI, Grant sued Dr. Heidorn, Dr. Sumnicht, and Dr. Sauvey, alleging that they were deliberately indifferent to his knee pain because they "obdurately refused" to order an MRI or orthopedic consult despite years of ineffective conservative treatment. At screening the judge permitted Grant to proceed on these claims (on appeal Grant does not challenge the court's dismissal of others). Grant then moved for the recruitment of counsel, but the judge deemed the case straightforward and found him capable of representing himself at that stage. Grant never renewed his request for counsel.

The defendants moved for summary judgment, and the judge granted the motion. He concluded that the doctors had not persisted in a course of treatment they knew to be ineffective and instead exercised their medical judgment in prescribing, and continuously adjusting, conservative treatment for Grant's knee.

### II. Analysis

On appeal Grant challenges the entry of summary judgment, which we review de novo, viewing the record in the light most favorable to him. *Shields*, 746 F.3d at 786. To survive summary judgment, Grant needed to present evidence that his doctors acted with a "sufficiently culpable state of mind," meaning that in treating his knee, they knew of but disregarded a substantial risk of harm to his health. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

Grant primarily argues that the doctors stubbornly refused to order an MRI or orthopedic referral, instead persisting for years in the same "conservative courses of treatment that they knew to be ineffective," needlessly prolonging his pain and exacerbating his knee condition. A decision "to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain and other symptoms can give rise to liability—or, at the very least, raise enough questions to warrant a jury trial." *Goodloe v. Sood*, 947 F.3d 1026, 1027–28 (7th Cir. 2020); *Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005). "Inexplicable delay" that exacerbates an inmate's medical

condition or unnecessarily prolongs suffering can also show deliberate indifference. *Goodloe*, 947 F.3d at 1031; *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). But this is not such a case.

The record shows that Grant's doctors believed a degenerative joint condition caused his knee pain, and they provided treatment accordingly. Grant has no evidence that their diagnoses and treatment were not the product of the doctors' professional judgment or were "blatantly inappropriate." *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."). He also has no evidence that his doctors were wrong about the cause of his pain—despite his speculation about a long-standing meniscal tear. And even if they were wrong, failing to correctly diagnose a condition is evidence of negligence, not deliberate difference. *See Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017).

Nor does this record show that Grant's three primary-care doctors persisted in a course of treatment they knew to be ineffective; rather, each doctor modified Grant's treatment over time in an attempt to manage pain they believed was caused by degenerative joint disease. *Cf. Greeno*, 414 F.3d at 654–55 (continuing to treat severe vomiting and reflux pain over several years with the same antacids the medical staff knew were ineffective created a material fact issue). Although "the rendering of *some* medical care does not necessarily disprove deliberate indifference," *Cesal*, 851 F.3d at 723, on this record the frequent treatment of Grant's knee pain while the doctors also attempted to deal with his more pressing back problems precludes a finding that they displayed deliberate indifference. Indeed, Dr. Tannan's decision to continue the same course of conservative treatment until Grant's condition began to worsen and his knee lost functionality supports the appropriateness of the doctors' professional judgment.

The crux of Grant's complaint is that he wanted an MRI and orthopedic consult much sooner than he received them. Yet "[a]n MRI is simply a diagnostic tool, and the decision to [forgo] diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). To be sure, Grant wanted different care than that provided by his doctors. But an inmate "is not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)), and disagreement over a course of treatment does not establish a constitutional violation, *see Pyles*, 771 F.3d at 409; *see also Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (noting

that "mere failure" to choose the *best* course of action does not amount to a constitutional violation).

Grant also contends that the judge abused his discretion by denying Grant's request for recruited counsel. In determining whether to appoint counsel, the judge must consider whether the plaintiff has made a reasonable attempt to obtain counsel and whether, given the difficulty of the case, the plaintiff appears competent to litigate the case himself. *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) (citing *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc)). Although the judge's consideration of the second factor was minimal in this case, given the timing of Grant's request—a few days after the court's screening order—we see no abuse of discretion. *See Pruitt*, 503 F.3d at 655–56 (limiting appellate review to the record at the time of the district court's decision not to appoint counsel). Grant's filings up to that point were competent. He had filed a complaint, successfully obtained leave of the court to amend, largely survived screening, and sought reconsideration of the screening order. Although Grant now says he relied on the assistance of other prisoners in preparing those filings, he did not inform the judge of that fact. At that early phase, it was not an abuse of discretion to conclude that Grant could competently litigate his case, and the judge stated that he would be open to reconsidering his decision later. *See Mapes v. Indiana*, 932 F.3d 968, 971 (7th Cir. 2019) (acknowledging "the difficulty of accurately evaluating the need for counsel in the early stages of pro se litigation"); *Romanelli v. Suliene*, 615 F.3d 847, 852 (7th Cir. 2010).

Finally, Grant argues that the judge improperly relied on the defendants' declarations as undisclosed expert-witness testimony. Grant did not raise this argument before the district court, and so it is waived. *See Allen v. City of Chicago*, 865 F.3d 936, 943 (7th Cir. 2017).

AFFIRMED